NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190411-U

NO. 4-19-0411

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 6, 2020
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| RICK A. JOHNSON,<br>            Plaintiff-Appellant,<br>                    v.<br>AMEREN ILLINOIS CO., a Utility Corporation<br>Licensed to do Business in the State of Illinois,<br>            Defendant-Appellee. | ) Appeal from the<br>) Circuit Court of<br>) McLean County<br>) No. 16CH219<br>)<br>) Honorable<br>) Rebecca S. Foley,<br>) Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Knecht and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) By failing to make a contemporaneous objection, plaintiff has forfeited his argument that defendant's motion for a judgment at the close of plaintiff's case (see 735 ILCS 5/2-1110 (West 2018)) was procedurally impermissible.

(2) Plaintiff failed to come forward with relevant evidence of a wrongful interference with his possessory rights in his property, and thus the circuit court was right to grant defendant's motion for a judgment on plaintiff's claim of trespass.

¶ 2    Plaintiff, Rick A. Johnson, sued defendant, Ameren Illinois Company, for trespassing on his land, damaging a fence, cutting down trees, and spraying vegetation with herbicide. At the conclusion of plaintiff's evidence, the McLean County circuit court granted a motion by defendant for a judgment against plaintiff and in defendant's favor. See 735 ILCS 5/2-1110 (West 2018). Plaintiff appeals on two grounds.

¶ 3    First, plaintiff argues that by having defense exhibits admitted during his case, defendant commenced its own case before plaintiff's case was finished and, therefore, the section 2-1110 motion was procedurally impermissible. We hold that plaintiff has forfeited this issue by failing to make a contemporaneous objection.

¶ 4    Second, plaintiff argues that the judgment in defendant's favor was unjustified on the merits. We hold, in our *de novo* review, that the circuit court was correct to grant defendant's motion pursuant to section 2-1110 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1110 (West 2018)). See *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 275 (2003). The record appears to lack any evidence that during the period specified in the second amended complaint—October 19, 2016, onward—defendant exceeded or misused its power-line easement. See *Duresa v. Commonwealth Edison Co.*, 348 Ill. App. 3d 90, 102 (2004). Given the issues framed by the second amended complaint, there was no relevant evidence of a wrongful interference with plaintiff's actual possessory rights in his property. See *Great Atlantic & Pacific Tea Co., Inc. v. LaSalle National Bank*, 77 Ill. App. 3d 478, 482 (1979). Therefore, we affirm the judgment.

¶ 5    I. BACKGROUND

¶ 6    A. The Pleadings

¶ 7    1. *The Second Amended Complaint*

¶ 8    In his second amended complaint, plaintiff alleged that defendant, through its agents, "undertook a course of conduct beginning, but not limited to[,] October 19, 2016[,] which included the following":

"(a) Without notice, a crew of 6 men, hired by the Defendant, entered the Plaintiff's property from the North, cutting a hole in the existing, usable fence between the Plaintiff's home and a neighboring farm; and,

(b) Without notice, the crew, having entered through the broken fence, cut trees on the Plaintiff's property; and,

(c) Without notice, the Defendant's crew proceeded toward the Plaintiff's home, alarming the Plaintiff's family members; and,

(d) The Defendant, through its agents, after felling the respective, healthy trees, left the trees, in total, without any clean up or broken down for access to move.

(e) In addition, the Defendant, through its agents sprayed the trees and vegetation killing the growth on the Plaintiff's property in its entirety."

This entry onto plaintiff's property, he further alleged, "was without permission and done in complete disregard of the care of Plaintiff's property."

¶ 9                            2. *The Affirmative Defense*

¶ 10         Defendant raised an affirmative defense: defendant owned right-of-way easements, which allowed defendant to enter onto plaintiff's property and trim or remove trees that interfered with defendant's power lines. Defendant pleaded that, pursuant to the easement, it hired Nelson Tree Service, Inc., to "enter[ ] upon Plaintiff's property on October 19, 2016[,] and subsequently in December of 2016 to remove trees that were interfering with its power lines."

¶ 11                           B. The Pretrial Stipulation

¶ 12         On September 5, 2018, the parties entered into a "Stipulation of Agreed Facts." According to the stipulation, plaintiff owned two adjacent lots in Heyworth, Illinois, and defendant owned some utility transmission lines that ran north and south and crossed over the eastern edge of plaintiff's land. Plaintiff's land was " 'perpetual[ly]' " burdened by a utility easement granted by Joseph and Elizabeth Werner on May 11, 1926, to Illinois Power and Light Corporation (Illinois

- 3 -

Power). In 2016, defendant, as the corporate successor to Illinois Power, owned the easement. Not only did the easement give Illinois Power (and hence defendant) the right to erect, maintain, and repair steel towers and transmission lines on the land and to transmit electricity through the lines, but it also gave Illinois Power " 'the right to trim or remove such trees as interfere[d] with said line.' "

¶ 13 The concluding two paragraphs of the stipulation stated as follows:

"9. On October 19, 2016, Nelson Tree Service, Inc., a contractor hired by [defendant], cut down three trees on the Property.

10. On December 28, 2016, Nelson Tree Service, Inc., a contractor hired by [defendant], cut down eight trees on the property."

¶ 14 C. Plaintiff's Motion to Amend His Second Amended Complaint

¶ 15 On September 10, 2018, plaintiff moved to amend paragraph 3 of his second amended complaint. Again, paragraph 3 presently read that defendant "undertook a course of conduct *beginning*, but not limited to October 19, 2016." (Emphasis added.) The proposed amendment would have substituted "including" for "beginning."

¶ 16 The motion, however, was never called for a hearing and was never ruled on.

¶ 17 D. The Bench Trial

¶ 18 The bench trial was held on February 26, 2019, and it began with opening statements. Defendant's attorney called attention to the stipulation the parties entered into the preceding year and which they had filed with the circuit court.

¶ 19 After the opening statements, the judge told plaintiff's attorney he could call his first witness.

¶ 20 1. *Plaintiff's Case-in-Chief*

- 4 -

¶ 21                             a. The Testimony of Hugo Herrera

¶ 22        Hugo Herrera was the proprietor of H & H Landscaping & Maintenance, Inc., and had been in the landscaping business for about 10 years. In June or July 2018, at plaintiff's request, Herrera went to plaintiff's land, located between Bloomington and Heyworth, to prepare an estimate on removing stumps, replacing trees, and restoring grass. The area in question was about 50 or 60 feet from plaintiff's house. A creek ran toward the back of the property. Power lines were overhead. The grass was brown and dead. There were approximately 10 stumps. Herrera's estimate does not appear to be in the record.

¶ 23                             b. The Testimony of Dale Naffziger

¶ 24        Dale Naffziger was the proprietor of Growing Grounds Garden Center and had been in the landscaping business for 50 years. A couple of years earlier—Naffziger could not remember exactly when—plaintiff contacted him about "[s]ome trees that were cut that were supposedly not within the easement." Plaintiff "wanted approximate values on how to estimate it and figure out what it was worth." Naffziger went to plaintiff's land, measured the circumference of the stumps, and tried to determine what kinds of trees they were. Because most of the stumps "had a good live bark collar," Naffziger assumed they were still alive, although he could not be sure. The stumps, alive or dead, could be removed, but replacing them with comparably mature trees was not feasible. Naffziger gave an estimate (plaintiff's exhibit No. 2) of $19,635 to replace 11 trees with trees of a manageable size. There was "no way to put a price on the time it [would] take to [regrow] these trees." Nor was he able to opine on the value of plaintiff's land before and after the trees were cut down.

¶ 25                             c. Elizabeth D. Johnson

¶ 26        Elizabeth D. Johnson is plaintiff's daughter, and she was living with him in October 2016. (We will refer to plaintiff's family members by their first names since they have the same last name and referring to them repeatedly by their full names would be cumbersome. We intend no familiarity or disrespect.) One day in October 2016, Elizabeth was getting ready for work. When walking out of the bathroom, naked, she saw a shadow pass by outdoors:

> "So I walked out of the bathroom and I saw this, you know, shadow. Wasn't for sure what it was at first. And then it walked by again because we have both sliding doors, and so this one didn't have any blinds ***[.] [It] looked like a shape of a human walking by as I'm walking out into my bedroom. And then going by I knew it was a shape of a human, because I knew that wasn't the shape of an animal walking by the other window."

¶ 27        Elizabeth hurried up and got dressed, and when she looked outside, she did not see anyone near the house, but she saw a truck parked on the other side of the creek. "[M]en were cutting down trees," "back towards where the power lines [were], the back part of [plaintiff's] property." She telephoned plaintiff about the strangers cutting down trees. Plaintiff wanted her to stay there until he arrived, but she was late for work and had to leave.

¶ 28        After the crew finished, a stand of trees that had screened the house from the highway was gone. Elizabeth testified: "I just feel like—I mean, I felt like there were trees cut that I didn't—I mean, I felt trees were cut that didn't need to be ***."

¶ 29                    d. The Testimony of Angela Johnson

¶ 30        Plaintiff's wife, Angela Johnson, was unable to say when in 2016 the workers came onto her and plaintiff's property. There had been "so many different times that they came out that

[she] honestly [could not] say for sure." "[T]here were several times in the fall[,] and then there were two times in the summer."

¶ 31       On the first occasion, there was a crew of seven men, and they were spraying with a long wand. At that time, Angela heard no chainsaws or axes.

¶ 32       About three weeks later, the men came onto the property again, but because pine trees screened them from view, Angela could not see what they were doing. All she could tell was that they were speaking to one another in Spanish. She called plaintiff, who yelled at the men and persuaded them to leave.

¶ 33       Mature trees used to stand on the property, near the creek. Angela testified:

> "There was one tree in particular that was *** on our property. There was a mature—it was like a decorative tree, so it was full maturity, I would say 14, 15 feet, nowhere near the power lines ***. *** And they cut the tree down. And they didn't just cut the tree down, but they actually let it fall across the creek."

¶ 34       And that was not the only tree that defendant cut down. A stand of trees that formerly blocked the house from being seen from the highway had been removed. Now passersby on the highway could see Angela in the swimming pool on the deck. There was a considerable loss of privacy.

¶ 35       On cross-examination, Angela was asked:

> "Q. And, if I understand the timeline ***[,] you know there were occasions *** when you were at home and people would come on the property, but you are not able to give us specific dates and say it was August 22nd of this year or anything like that, true?
>
> A. Correct, I did not document that."

¶ 36                                        e. Plaintiff's Testimony

¶ 37        Plaintiff had lived on the Heyworth property since 1990 or 1991, and it used to be that he and defendant had an informal arrangement whereby defendant's forester would telephone plaintiff and meet with him ahead of time. They would walk the property together and come to an agreement on which trees were to be cut away from defendant's power lines. After someone else, a woman named Michelle, took over the forestry job, tree-cutting crews began showing up without prior notice. This change came probably in 2016 or a little before then.

¶ 38        At this point in the trial, plaintiff interjected:

> "[E]veryone is a little bit confused. They are just kind of focusing on October '16 and December. What happened in December is not even part of our suit, you know. We are not even—it's all what happened before that, and that's what I think counsel here is a little bit misunderstanding or miscommunicated [*sic*] to."

¶ 39        This drew an objection from defendant's attorney. He objected insomuch as plaintiff sought to recover for any events earlier than the period specified in the second amended complaint:

> MR. WILSON: Just, for the record, I want to enter an objection as to what's at issue. The complaint defines what's at issue in this case, and it describes the events in October of 2016. So I object to relevance to the extent [plaintiff] tries to go outside of what's in the complaint as far as seeking any causes of action or damages in this case. If he wants it as background, that's fine, but I'm not waiving the fact that the complaint in this case is very specific as to what they are suing for."

¶ 40        The circuit court responded that although it was possible to amend a complaint to conform to the proof, the court was "using the complaint, the Second Amended Complaint, as its

framework for this lawsuit right now." With that bit of guidance, the court told plaintiff's attorney he could continue.

¶ 41        Plaintiff's attorney asked plaintiff if defendant's changed policy of showing up without notice "turn[ed] into an issue at some point." Plaintiff answered:

> "Yes. In October, '16, which is the one of the dates when the two individuals were cutting on the tree when Liz called me, at that point in time I *** drove straight down into the bottom myself. They were actually leaving, and so at that point in time I was yelling at them because there was—a tree right there cut laying down, and they were in their truck when I got there pulling out."

¶ 42        Plaintiff's attorney asked him if he was "ever notified that there was going to be anybody from [defendant] or elsewhere out there spraying." Plaintiff answered that probably toward the end of 2015, one of defendant's employees, a man named Tom, called plaintiff and told him that defendant intended to do some spraying on the property. The two of them made arrangements to meet and walk around the property so that Tom could show plaintiff where the proposed spraying would be done. As they were walking on the property, Tom told plaintiff:

> " ['O]h, my gosh, Mr. Johnson, I'm sorry.['] He goes[,] ['T]hey've already been here.['] And so then he proceeded to walk around and show me what they had done. And at that point in time is when the decorative tree that Angie was talking about, they just hacked into it, made a V and sprayed it. And there was several other trees along the brim of the property. And all the weeds and everything there, they sprayed it all.
>
> I caught them out there two to three times myself ***."

¶ 43    Defendant's attorney "renew[ed] [his] objection *** to the extent that this answer [went] well outside any of the allegations fairly taken within the scope of the Second Amended Complaint." The circuit court ruled:

> "THE COURT: Sustained to the extent that it's being offered as substantive evidence as opposed to background.
>
> MR. BARRY [(PLAINTIFF'S ATTORNEY)]: It is being offered as background, plus it may have something to do with relevance as we get into the actual date.
>
> THE COURT: All right."

¶ 44    Plaintiff's attorney then asked plaintiff about the damage to the fence. He testified the fence had been cut and pulled open. Plaintiff's attorney asked him:

> "Q. Did you do that?
>
> A. No, sir.
>
> Q. Did you at any time authorize anybody to do that?
>
> A. No, sir.
>
> Q. And this was something you noticed at or about the time there were people out there spraying?
>
> A. Um, either spraying or—not so much spraying, but couple months before October 16 [*sic*] is when they did the most damage and they cut down all the trees that Mr. Naffziger was referring to and also Mr. Herrera.
>
> MR. WILSON: Same objection. He's well outside the scope of what's in the complaint.
>
> THE COURT: Sustained."

- 10 -

¶ 45        Plaintiff's attorney then requested "some leniency with regard to the testimony." He represented to the circuit court that there was correspondence between him and defendant's attorney discussing that the events in question could have been somewhat earlier than October 2016:

> "MR. BARRY: I've got to locate that correspondence. But, in light of that, I'm not trying to catch anybody off guard. Everybody knows they were out there from August, September into October 2016.
>
> MR. WILSON: And to respond and say everybody knows, well, I don't know that, and had there been any amendment to the complaint identifying specific earlier dates or even months[,] I could have gotten witnesses who allegedly were there and work with the people from [defendant] to identify them. The people that I have identified and have called for the defense are going to talk about what happened in October of 2016 and December of 2016, which is what the complaint relates to."

¶ 46        Plaintiff's attorney argued that he was not requesting "a huge amendment." He was only requesting "that [they] eliminate the word 'beginning' and then include 'on or about the time frame surrounding October 19, 2016.' " The circuit court replied: "Well, everyone might have a different definition of what's a huge amendment. So I think I'm going to need—if this was memorialized in writing, I think I'm going to need to see that."

¶ 47        Without producing the requested written memorial, plaintiff's attorney resumed his direct examination:

"Q. (By Mr. Barry) Mr. Johnson, when you said that the—I think your last comment was the majority of the damage was done prior to the—well, definitely prior to the December incident, but in October. Can you describe what happened?

A. This is either the end of August or the beginning of September of 2016. There were a group of subcontractors that were up on the corner of my property, the berm, and I didn't realize they were there because they start a little earlier in the morning than I do. And by the time I heard them, by the time I got out, there they had already cut down approximately 12 trees. So I went out there and spoke to them at that point in time and they said the same thing that they always say: [']We are doing what we were told to do.['] So I told them, I said[,] ['T]his is my property and this is not anywhere near underneath your lines.['] "

¶ 48 The tree-cutting in December 2016 was less contentious. By then, the parties had reached an agreement (defense exhibit Nos. 12 and 13) "with regard to certain trees that [plaintiff] agreed to let them cut down." Accordingly, as plaintiff's attorney clarified for the circuit court:

"Q. We're not talking about those trees. We are talking about something done before December—

A. Correct.

Q. —of 2016. And this would have included the trees which are identified in Mr. Naffziger's estimate?

A. Correct.

Q. And that would have included the ornamental tree—

A. Correct.

Q. —that your wife testified to?

A. Correct."

¶ 49 After the close of plaintiff's evidence, the circuit court again requested the correspondence that plaintiff's attorney mentioned earlier:

"THE COURT: First thing you are going to need to do, Mr. Barry, is locate this correspondence that you have referenced to help guide the Court in terms of how the Court is to view the evidence in this case. Because right now the Court is going to view the evidence in the light of the Second Amended Complaint which reads: [']Course of conduct beginning but not limited to October 19th of 2016.['] Along with the stipulation[,] Paragraphs 9 and 10[,] references three trees being cut on October 19th and 8 trees on December 28th which, doing the math, would leave Plaintiff's Exhibit 2 [(Naffziger's damage estimate)] really only referring to the three trees on October 19th because you're indicating—your client indicated he's not making a claim about anything from December 28th.

MR. BARRY: That is correct."

¶ 50 Defendant's attorney noted that the motion to amend the second amended complaint failed to reference any specific date other than October 19, 2016. "And it was never represented to me," he added, "that that was their intention through that amendment to say we want to talk about something that you did in August or July or whatever. We are a fact pleading state."

¶ 51 Still lacking a copy of the aforementioned correspondence, the circuit court ultimately ruled as follows:

"THE COURT: Okay. Well, what I'm telling you, I guess, is that based upon the stipulation that only three trees were cut in October of 2016, the complaint,

- 13 -

Second Amended Complaint and even the Motion to Amend the Second Amended Complaint makes no reference to any dates or course of conduct on any specific time frame preceding the October 2016 timeframe. Court's not going to consider any evidence of any trees cut down before then, because it would be prejudicial to the defendant. How is the defendant supposed to know what it is defending if no specific time frames are referenced or it's not been disclosed in fact discovery? Your client has absolute control and knowledge of what happened and when it happened, and the defendant has to be apprised of that. If the defendant is first hearing at trial that most of these trees were cut, the majority of damage was done prior to October 2016 including the claim that the fence was cut and pulled back prior to 2016, that's been within your client's control the entirety of this litigation.

MR. BARRY: That is correct.

THE COURT: So, I will admit Plaintiff's Exhibit 2, but, so that parties know, I am only considering it to the extent of three trees which are referenced in the stipulation of facts in conjunction with all the other evidence.

MR. BARRY: Can I just go on record as taking exception to that?

THE COURT: Absolutely."

¶ 52                    2. *The Section 2-1110 Motion*

¶ 53          After the ruling limiting the case to the three trees felled in October 2016, defendant moved for a judgment in its favor (see 735 ILCS 5/2-1110 (West 2018)). The circuit court granted the motion because the court found each subparagraph of paragraph 3 of the second amended complaint to be unsupported by any evidence. Subparagraph by subparagraph, the court reasoned as follows.

¶ 54        Subparagraph (a) alleged that a crew of men cut a hole in the fence and entered onto plaintiff's land. There had been no testimony as to who cut the fence. Besides, the fence was cut outside the period specified in the second amended complaint.

¶ 55        Subparagraph (b) alleged that, without notice, a crew entered through a break in the fence and cut down trees on plaintiff's land. Under the easement, however, no notice was required before defendant entered onto plaintiff's land and trimmed or cut down trees " 'interfer[ing] with' " its power lines, to quote from the easement. It was undisputed that defendant cut down some of plaintiff's trees, but plaintiff had presented no evidence that by cutting down those trees—more precisely, those three trees in October 2016—defendant exceeded the scope of the easement.

¶ 56        Subparagraph (c) alleged that defendant's crew proceeded toward plaintiff's home. Elizabeth Johnson testified that she saw a shadow, but "[s]he did not testify as to anyone she saw[,] specifically." Although one might infer that the shadow belonged to a member of defendant's crew, there was no evidence that this person "was proceeding toward the house."

¶ 57        Subparagraph (d) alleged that defendant had cut down healthy trees and had left them where they fell, without doing any cleanup. There was no evidence that the felled trees had been healthy.

¶ 58        Finally, subparagraph (e) alleged that defendant had sprayed the trees and vegetation, thereby denuding plaintiff's property. There was no testimony that such spraying occurred within the time frame alleged in the second amended complaint. Although Angela Johnson had testified to seeing men doing some spraying, she was nonspecific about the date and seemed to suggest that she saw the spraying in the summer of 2016—which, again, was outside the period alleged in the second amended complaint.

¶ 59        For those reasons, the circuit court granted the section 2-1110 motion and entered a judgment in defendant's favor.

¶ 60        This appeal followed.

¶ 61                        II. ANALYSIS

¶ 62        A. The Issue of Whether the Section 2-1110 Motion Was Procedurally Permissible

¶ 63        In a bench trial, the defendant may move for a judgment in the defendant's favor at the close of the plaintiff's case. 735 ILCS 5/2-1110 (West 2018). Defendant made such a motion, which the circuit court granted.

¶ 64        Plaintiff challenges this ruling, and he first does so on procedural grounds. Plaintiff argues that by having defense exhibits (the December 2016 tree-cutting agreements) admitted during plaintiff's case, defendant managed to begin its own case before the close of plaintiff's case. Plaintiff argues it was a procedural error to entertain defendant's section 2-1110 motion after defendant's case began.

¶ 65        Defendant responds, initially, that because plaintiff never raised this procedural objection when defendant made its section 2-1110 motion, the issue is forfeited. (Defendant then goes on to argue that the procedural objection lacks merit.) Plaintiff raised the issue later, in his posttrial motion, but "[a] party forfeits an issue for appellate review unless he has raised the issue *both* at trial and in a posttrial motion." (Emphasis added.) *Tully v. McLean*, 409 Ill. App. 3d 659, 664 (2011). When defendant made its section 2-1110 motion, plaintiff did not specifically argue to the circuit court that because defendant had exhibits admitted during plaintiff's case-in-chief, the motion was procedurally impermissible. The issue is therefore forfeited, and we do not reach the merits of the issue. See *id.*

¶ 66                B. The Merits of the Section 2-1110 Ruling

- 16 -

¶ 67                                    1. *How Section 2-1110 Works*

¶ 68            When at the close of the plaintiff's case the defendant moves for a judgment in the

defendant's favor (see 735 ILCS 5/2-1110 West 2018)), the circuit court first has to decide whether

the plaintiff has made out a *prima facie* case, that is, whether the plaintiff has "presented at least

some evidence on every element essential to [the plaintiff's] cause of action." *Kokinis v. Kotrich*,

81 Ill. 2d 151, 154 (1980). If the court decides that an element of the plaintiff's case lacks any

supporting evidence whatsoever, the court should grant the defendant's motion and enter a

judgment in the defendant's favor. *Id.* at 155. Alternatively, if the court decides that the plaintiff

has made out a *prima facie* case, the court should weigh all the evidence, draw reasonable

inferences from the evidence, and assess the credibility of the witnesses, as a trier of fact would

do if the defense had rested at the close of the plaintiff's case. *Sherman*, 203 Ill. 2d at 276; *In re

Estate of Etherton*, 284 Ill. App. 3d 64, 67-68 (1996). This second-stage evaluation of the evidence,

the supreme court explains, can end up invalidating some essential evidence in the plaintiff's

*prima facie* case, or, alternatively, the plaintiff's *prima facie* case can survive, with the result that

the bench trial advances to the defendant's case:

> "This weighing process may result in the negation of some of the evidence
> necessary to the plaintiff's *prima facie* case, in which event the court should grant
> the defendant's motion and enter judgment in his favor. On the other hand, if
> sufficient evidence necessary to establish the plaintiff's *prima facie* case remains
> following the weighing process, the court should deny the defendant's motion and
> proceed as if the motion had not been made." *Kokinis*, 81 Ill. 2d at 155.

¶ 69            In sum, then, the granting of a section 2-1110 motion is a finding that the plaintiff's

evidence, considered in and of itself, is insufficient. The insufficiency can be a failure to present

any evidence at all on one or more of the elements of the plaintiff's *prima facie* case (the first stage). Or the insufficiency can be a failure to present evidence that the circuit court, as the trier of fact, finds to be convincing (the second stage). If the reason for the granting of the section 2-1110 motion is a failure to present any evidence at all on one or more of the elements of the plaintiff's *prima facie* case, our standard of review is *de novo*. *Sherman*, 203 Ill. 2d at 275. If, on the other hand, the court found that the plaintiff had presented *some* evidence on every element of the *prima facie* case but the court's second-stage evaluation negated some of that essential evidence, we decide whether the court's decision is against the manifest weight of the evidence. *Id.* at 276.

¶ 70        It is agreed that, in granting defendant's section 2-1110 motion, the circuit court found a failure by plaintiff to make out a *prima facie* case. Our standard of review, therefore, is *de novo*. See *id.* at 275.

¶ 71                2. *An Essential Element of a Cause of Action for Trespass:*
                    *Entry Without Permission, Invitation, or Other Right*

¶ 72        To allege a trespass to real property, the plaintiff must allege a *wrongful* interference with the plaintiff's actual possessory rights in the property. *Loftus v. Mingo*, 158 Ill. App. 3d 733, 744 (1987). A trespass is, by definition, the entry of another's land without permission, invitation, or other right. *Benno v. Central Lake County Joint Action Water Agency*, 242 Ill. App. 3d 306, 313 (1993). Accordingly, plaintiff alleged in his second amended complaint that "[t]he entry onto Plaintiff's property by the Defendant's agents was without permission."

¶ 73        Normally, proof of that allegation would be enough to make out a *prima facie* case of trespass. Plaintiff had the burden to come forward with proof of a negative, namely, that defendant lacked a right to enter onto plaintiff's property and cut down his trees. See *Loftus*, 158 Ill. App. 3d at 744. When a party has to prove a negative proposition, the party need not make "plenary proof," which could be impossible. (Internal quotation marks omitted.) *Upper Salt Fork*

*Drainage District v. DiNovo*, 385 Ill. App. 3d 1083, 1097 (2008). Instead, all the party has to do is come forward with enough evidence to reasonably justify a finding—if no contrary evidence were presented—that the negative proposition is true. *Id.* Typically, in an action for trespass, proof that the plaintiff never gave the defendant permission to come onto the plaintiff's land would make out a *prima facie* case. See *Rodriguez v. Norfolk & Western Ry. Co.*, 228 Ill. App. 3d 1024, 1039 (1992). If the defendant claimed a source of authority other than the plaintiff's permission, such as an easement, that would be the subject of an affirmative defense. See *Rosenthal v. City of Crystal Lake*, 171 Ill. App. 3d 428, 436 (1988).

¶ 74　　　　But this is not a typical case, for the trial began with a stipulation that the defendant had an easement giving defendant "the right to trim or remove such trees as interfere with said line." Thus, to make out a *prima facie* case of trespass in this case, it was not enough for plaintiff to allege and prove that defendant lacked permission to come onto plaintiff's land and cut down trees; holders of easements do not need the current landowner's permission (see *Mueller v. Keller*, 18 Ill. 2d 334, 340 (1960)). Rather, plaintiff had to come forward with evidence that defendant exceeded the scope of the easement. See *Duresa*, 348 Ill. App. 3d at 101-02. That is, plaintiff had to come forward with evidence that when defendant cut down plaintiff's trees, they were not striking against or getting in the way of defendant's power lines. See New Oxford American Dictionary 885 (2001) (defining "interfere" as "(of a thing) strik[ing] against (something) when working" or "get[ting] in the way of").

¶ 75　　　　In other words, to make out a *prima facie* case of trespass, plaintiff had to come forward with evidence that the three trees that defendant cut down on October 19, 2016, were not coming in contact with defendant's power lines. We see four places in the trial transcript when the reason or lack of reason for cutting down trees was discussed.

¶ 76    First, Elizabeth D. Johnson "felt that trees were cut" in October 2016 "that didn't need to be." The issue, though, was not whether she felt the trees needed to be cut. Rather, the issue was whether the trees had been in contact with defendant's power lines.

¶ 77    Second, Angela Johnson testified that defendant cut down a "decorative" tree that was "nowhere near the power lines." She could not say, however, exactly when defendant cut down this tree. Plaintiff testified it was toward the end of 2015 "when the decorative tree that Angie was talking about" was "hacked into" and "sprayed." (A way to kill a tree is to chop a gash in the bark and spray the exposed tissue with poison.) So, the killing of the "decorative" tree was before the period alleged in the second amended complaint.

¶ 78    Third, plaintiff testified that the "approximately 12 trees" that defendant cut down at the end of August or beginning of September 2016 were "not anywhere near underneath [defendant's] lines." Again, this predated the period alleged in the second amended complaint.

¶ 79    Fourth, plaintiff testified that in December 2016 defendant cut down trees with his agreement. Those trees were not at issue in this lawsuit, as plaintiff and his attorney made clear.

¶ 80    Thus, insomuch as the issue of power-line interference came up in the trial, it was in connection with trees that were cut down with plaintiff's consent or trees that were cut down before October 19, 2016.

¶ 81    Even the damage to plaintiff's fence appears to predate the period alleged in the second amended complaint—setting aside the problem that the record lacks any evidence of who damaged the fence. The fence, to quote again from plaintiff's testimony, was severed and pulled apart by some unknown vandal a "couple [of] months before October 16," 2016, "when they did the most damage and they cut down all the trees."

¶ 82	Nor do we know to whom the shadow belonged that plaintiff's daughter saw sweep by outside the sliding glass door.

¶ 83	3. *Variance*

¶ 84	"The issues in a case are created by the pleadings and allegations, to which the proof must correspond. [Citation.] Consequently, a party cannot have relief based on proof without allegations." *Morris v. City of Chicago*, 130 Ill. App. 3d 740, 744 (1985). The issue framed by the second amended complaint was whether defendant trespassed on plaintiff's land and cut down his trees "beginning, but not limited to[,] October 19, 2016." The proof in the bench trial had to correspond to that issue. See *id.*

¶ 85	It is true that an immaterial variance from the pleadings is allowable. See *Thilman & Co. v. Esposito*, 87 Ill. App. 3d 289, 296 (1980). "The rule is that no variance shall be deemed material unless it misleads the adverse party to his prejudice." *Id.* Arguably, defendant was unfairly surprised by proof of tree-cutting that occurred outside the period specified in the second amended complaint. See *id.* It is not that there was only one episode of tree-cutting and that defendant therefore should have understood that plaintiff meant that episode even though the date in the second amended complaint was a couple of months off. The evidence, rather—some of which the circuit court let in merely as background information—was that defendant came onto plaintiff's property and cut trees on multiple occasions, in the summer, fall, and winter of 2016. Defendant, in reliance on the second amended complaint, may well have come to the trial prepared to address only the tree-cutting it did, or hired done, "beginning, but not limited to[,] October 19, 2016"— not any other tree-cutting. It was not an abuse of discretion, then, for the court ultimately to reject proof of tree-cutting that occurred outside the period alleged in the second amended complaint. See *Timothy Whelan Law Associates, Ltd. v. Kruppe*, 409 Ill. App. 3d 359, 371  (2011).

¶ 86                                    4. *Posttrial Amendment of Pleadings*

¶ 87            Although, under section 2-616 of the Code (735 ILCS 5/2-616(c) (West 2018)),

"[a] pleading may be amended at any time, before or after judgment, to conform the pleadings to

the proofs," the belated amendment must not offend due process by causing unfair surprise. "[D]ue

process requires that both parties know in advance of a proceeding what issues will be tried in that

proceeding." *Delarosa v. Approved Auto Sales, Inc.*, 332 Ill. App. 3d 623, 627 (2002). Allowing

plaintiff, in the midst of the trial, to amend his second amended complaint so as to allege an open-

ended period of time would have turned the trial into an ambush. The circuit court was within its

discretion to disallow such an amendment. See *Freedberg v. Ohio National Insurance Co.*, 2012

IL App (1st) 110938, ¶ 41.

¶ 88                                    III. CONCLUSION

¶ 89            For the foregoing reasons, we affirm the circuit court's judgment.

¶ 90            Affirmed.